So, good morning gentlemen. Before you, you have Justice Aurelia Puchinsky, Justice Cynthia Cobb, and myself, Justice Smith. The case we're dealing with today is People v. Jerry Initially, the appellant will start and we will not interrupt. You'll have 10-15 minutes. Then, we will ask questions after that. Then, the appellee will make his presentation and again, after that, we will ask our questions and then there will be the response and a few questions after that. And with that, you may proceed. Good morning, Your Honors. My name is Daniel Reikenscheid on behalf of Appellant Jerry Williams and in Mr. Williams' brief, we raised three issues. The first is the issue of the Fourth Amendment and Mr. Williams' seizure. Our argument is that Mr. Williams was seized at the time that responding police officers began shouting from their vehicle that they had a taser and were preparing to use it at the assorted crowd that had gathered on the street. Mr. Williams' response to that was a reasonable act of submission given the context of what was going on such that the seizure of the gun itself was the fruit of an unlawful seizure. The second issue is a counsel issue. We point out clearly from the record that counsel was appointed upon Mr. Williams' request and then the next day, there was no, although counsel was removed, there was no order from the court to remove counsel and Mr. Williams was not re-admonished as to his rights to counsel and making sure he had an informed waiver of counsel. And then, the third issue is the Illinois State Police FOID card letter which was introduced in lieu of testimony from anyone from Illinois State Police testifying such that the letter itself violated the Confrontation Clause and Mr. Williams had objected and so on all these accounts, they should be remanded for a new trial. As far as the first issue goes, the question is the police approach from their police cars in the officers were shouting from a distance that I have a taser, I haven't tased you, I'm going to tase you and Mr. Williams had moved to suppress in a motion. He was pro se throughout the entire proceedings except for them to bring up an issue too. He moved to suppress and the gun should have been suppressed as the fruit of an unlawful seizure because the police engagement from the vehicle shouting not stop, not stay where you are, not police, everybody freeze, shout that I'm going to tase you, I'm going to tase you, I'm going to tase you. It's not a clear order. It's clearly an infringement of liberty and that is the point at which we judge whether a seizure when a reasonable person understands that their liberty is being seized and I think in this force is, you know, it begins the seizure engagement and the infringement of liberty. And so then the next question is what is a reasonable person's, a reasonable innocent and law-abiding person's response to the police action? And frankly, I mean, this was not an otherwise innocent contact. This was not the police officers pulling up, getting out of their car, walking towards a group for which they had no other individualized suspicion. The phone calls about a large boisterous group of about 20 people but the point at which the police officers begin engaging with the crowd, there was no individualized suspicion for any individual person and so Mr. Williams upon hearing that he was at least being threatened with tasing or aware that there was a tasing going to happen within moments, moved to a side yard, discarded a gun and he testified at the motion hearing. He did this out of fear and when police in situations like this, when police have not given a clear order or not an order at all, just I'm going to tase you, this is what a reasonable law-abiding person might do in this situation in response to these particular circumstances. This is not a Wardlow situation where the crowd saw, or Mr. Williams in particular, saw the police arriving in an otherwise, you know, high crime area, whatever. There were no other factors here indicating what Mr. Williams should be doing in the situation besides the police making him aware that either he or someone else in nearby him was going to be tased. The police didn't exit with their hands on their guns like in other cases have been where that's a clear show of force that is reasonable given the circumstances of what the police are responding to. This was not the police, you know, like I said before shouting from the car, everybody freeze. The police didn't roll up with their lights on. They didn't turn on their their speakers. All we have is police arriving to this scene which varies, I again say, from the calls that were made. There was a group of 20 in this cause making, causing a commotion I believe was the way that the police officers described it. And they didn't arrive to that. They arrived to a group of six or seven guys hanging out maybe in the street, you know, shouldn't be in the street but that's not the justification that the police have to threaten the unlawful use of force which I think in this case was particularly outrageous. Six or seven people, police officers arriving and then these shouts of force directed at anyone or no one in particular. But what can a reasonable law-abiding person do in that situation was standing around and if they think suddenly they're going to be tased. Mr. Williams is moving to the side and discarding a gun is a completely reasonable response in this situation. Because after that, after that's when Officer Gracamontes actually had physical contact with them or, you know, close proximity, give him a direct order of what to do. And Mr. Williams complied at that point. But the seizure had been affected already at the point that the officers arrived and shouted their threats of tasing. His discarding of the gun was a clear response to that. And because of that, his dropping of the gun was not a response from the outset at the beginning. On the second issue of counsel, this is a fairly, I hate to say, clear-cut issue where Mr. Williams, after representing himself unsuccessfully at the motion hearing, realizes for whatever reason he needed counsel. He requested counsel and the judge appointed it. Public defender appointed. And the appointment of the public defender is a function of law. It's not a contract between the individual and the public defender. It's the appointing the public defender for the defendant. And that happened. It was, it was, it happened orally, which is the legal action of the court. And then, you know, just for our sakes, it ended up in the disposition sheet that the court appointed the public defender. And then the day went by so that they could calendar the next dates. And the public defender appeared physically, at least not in, not with a physical or with a written form. Public defender on Mr. Williams' behalf says, you know, Mr. Williams says he doesn't want counsel anymore. And at that point, we have a Cleveland scenario where it's the rare case that someone has asked for counsel, got counsel, and then declined counsel again. And at that point, the 401 admonishments were required. And so we miss both the fact that there was no formal withdrawal of the counsel, which issues of deprivation of counsel. And also the, at that point, the admonishments were required. I believe Mr. Williams hadn't been admonished since the beginning of the proceedings about seven months earlier. But that is of no issue because he requested counsel and then declined counsel and counsel was supposed to be removed. At that point, it was the court's obligation to re-administer the 401 admonishments, which it just plainly did not do. The court forgot that it ordered the appointment. It overlooked it. And I think the case law recognizes this is an odd scenario. This is not a spot where the courts have thought that the defendant can game the system by, I'm going to request counsel and then reject counsel and then request it and reject. It doesn't make a lot of sense because it's such a minor admonishment for the court to issue. They say, hey, if the court doesn't re-issue the admonishments after the appointment and then the withdrawal, then that's an error and it needs to go back for new counsel because it's denial of counsel. And then on the third issue, also that the state conceded at least the here's a problem here, which is a repeat of, I guess, a scenario that happens sometimes that rather than putting on a live witness or getting a stipulation, the state simply put on this letter, notarized to the extent that that matters. And it said he'd never had a FOID card, but that's not a sufficient live testimony to prove the element of lack of a FOID card. Um, and so, so then the question becomes, does, uh, officer, uh, Bracamonte's testimony that he said, oh, he doesn't have, you know, I asked him if he had a FOID card and he didn't say he had a FOID card, but the record isn't particularly clear as to what the question is. Um, I'm reading from record 175. You said you asked him whether he had a FOID card. Is that right? Yes. FOID answer. Yes. FOID concealed carry. He said, no, that doesn't answer the question as to whether Mr. Williams had a valid, uh, validly issued firearms license to carry at the time. Um, and certainly not as positive beyond a reasonable doubt here, which is what we are really looking for. Um, and so this case, I mean, he, he didn't, they didn't prove the element, um, or at least the evidence that they used to prove the element was, was hearsay. Uh, Mr. Williams objected at trial and therefore this be remanded on third ground as well. Um, that's the end of my presentation. And if there are any questions, I'd be happy to answer them. Well, I guess my first question is your client testified he never had a handgun in his possession, um, at any time that evening, how do we get around that? So that's in conflict with what you're indicating that he, you know, had the gun and, you know, that, that affects the whole Taser argument. It, it is a different position. He lost on the position that he didn't possess the gun and he's been convicted of that. Uh, I think I would, I would, uh, uh, a seed at this point that he, he was in possession of the gun at some point that evening and he did have the gun. He denied it. Uh, it was a poor denial. And on video, we, all we have is officer Bracamonte's testimony that he did have the gun. Um, the video only shows us finding the gun where officer Bracamonte's, uh, indicated that the gun was found. Um, I, I, on appeal, Mr. Williams had the gun and that's the only way that he could have, uh, that, that, that's the seizure of the gun is that he had the gun and then discarded it. He did not make that argument on, uh, trial level, at least on the motion hearing. Um, he did through, he lost at the motion hearing and then at trial, uh, when the arguments get made again, um, Mr. Williams again argues that there was not reasonable suspicion at the time that the police arrived. Um, it's a, it's a slightly different argument. I'll accept that point that, uh, Mr. Williams didn't raise the point precisely as, as we're raising it here, but throughout the, throughout the entire proceedings, Mr. Williams has argued that the initial context, the police did not have reasonable suspicion or probable cause to initiate the seizure. I think the record shows he did have the gun. And so the question is, should the gun have been suppressed at the point that, uh, you know, throughout the trial, when Mr. Williams was saying, uh, they didn't have reasonable suspicion to seize me from the outset, it was, it was a clunky pro se argument that he was saying he, he did not know how to articulate the way that he was, he, what he was trying to do. I think, um, his argument was with the initial contact. And I think that's the same argument here that the police arrival at that time is the, is the critical factor of, of, of whether the seizure occurred when the seizure occurred. Anybody else on that issue? Go ahead. Uh, Mr. Regency, he, uh, his brief, he admits he had the gun, but on top of that, you're talking about how the police even got there. And this court has already found that calls to the emergency management center are reliable enough for police to act on, especially in this case, where the call, one of the calls described this man and his clothing and said, there are two men with guns out planning to start shooting. Now, just as a practical matter, living in this community, um, if the police couldn't go to a location after having that information from the emergency management center, what should they do? Just ignore it. No, no, no. You're right. I live on the South side. I agree completely. And I think the argument is it's not, it's not that the police weren't allowed to arrive. They should, police should respond when there's a report of a gun. To me, the question is what did police do to the particular individuals when they arrived? Have they found the right people and what is their lawful use of force? If, if any of the officers had walked up to Mr. Williams and he had run, I, we would not be in this court on this argument right now. If any of the officers had ran, they couldn't walk up because he ran after the police arrived shouting, I'm going to tase you. I'm going to tase you. I think this is the critical point here is what does a person do when the Chicago police come at you saying that they're going to tase you and you are aware that you're in possession of a gun. Mr. Williams's was illegal, but the question for what to do, how one responds to the seizure is, is what do I do when the police are coming at me shouting that I have a taser or that they have a taser and I am going to tase you, not put your hands up, stop in the name of the law. You know, the case law is clear. And if this was, if this was, I mean, by far, almost any other situation in which the police arrive and a crowd disperses, we're not here on this argument and I'm arguing issue two and three, but the facts of this case are that the police arrived making threats of force on a, you know, a disparate crowd. The police can stop everyone for whom they have reasonable suspicion and probable cause. I'm not going to argue against that. Well, just for the sake of argument and for the sake of citizen and officer safety, if they have a call that says two men have guns out and they're getting ready to start shooting, I would want the police to be pretty alert to that and pretty on top of that situation and stop people from doing whatever they're doing just so that nobody gets shot. So you have these decisions that come in a very fast timeframe. You've got a bunch of guys, maybe six of them that are beginning to scatter. You've already, you already believe that they have guns and that they're going to start I think the officers probably are and are certainly allowed to take reasonable precautions to ensure their safety. I'm not sure escalating a situation, arriving, I'm going to tase you, is the safest method to ensure their safety, but yeah, that's on my practice. But what I think the issue is here is are the, how are the, what are the police responding to, you know, threats of a gun certainly, and what do they see upon their arrival? A group of six people about, there's not a commotion as Bracamontes indicated and there's not 20 people. It's not that the police couldn't have arrived with their, go ahead. Well, the police testified it was commotion. The court found their testimony reliable. Yes. I think, I think the, on the other hand, the video, I guess the video doesn't really offer much here because Bracamontes, the arresting officer doesn't, we don't see his camera getting out of the car and we don't see the initial arrival. Officer Duran, the most interesting video here, we see him arriving, but only from the position of the police car. And then following that, it's a disparate crowd of, you know, a couple of young people that are out on the sidewalks, obviously running after the police have responded. I think it's still, the police mistake here was arriving, making disparate threats of force on a crowd that had been arrayed. It didn't, the officers did not say that they saw a gun upon their arrival. It was, granted it was dark, it was 10 o'clock. This is not, you know, bright as day, but the officers do have a responsibility to engage citizens in a responsible manner and in a law-abiding constitutional manner when they're standing around on a sidewalk or on the street, the response of, I'm going to taze you. I think the police should take every precaution that is reasonable and constitutional. But the issue here is, did the police officers engage in an action in a way that a reasonable person would have understood themselves to be seized? And does that match the scenario upon which they were arriving? And when police arrived, no matter what the calls had said, it wasn't a great disparity, but there was a disparity here that the crowd of 20 was not fighting each other. They were not throwing things around. There was nothing. They were just milling about is what the officers said. And when they arrived, the police basically made their threats and then took off after everyone that was scattering, which would have been critically a reasonable law-abiding person in that scenario would have taken the same actions as the other people in that crowd, whether it's ducking for cover, moving to a yard, discarding anything that might get you caught by the Chicago police and making them feeling threatened or in trouble. The discarding of the gun and moving to a yard is the reasonable action of a law-abiding person. Mr. Williams was not in this scenario, but you get to judge him by the same standard as everyone else under the fourth amendment. Did the police action, this was not otherwise an offensive contact. They didn't pull up and say, everybody freeze. This is the police. It's the police rolling up and making threats and in a dark area, they did not have their lights on. You know, people probably knew it was the police, but we're all, it was the West side of Chicago. People responding to that were in fear. They were afraid of getting tased. Cynthia, you got any question on that issue? No, not on that one. All right. Well, let me ask him. Step down. In this situation where he recanted his position from June 1st to June 2nd, it's quite different than any of the cases that are cited anywhere. This is unique in the sense that you're going from one day when he says he wants, and then the next morning he says he doesn't. So the public defender never in any effect is involved directly. So there is really no break between his pro se and a public defender. If this was a situation where in the interim, the case has started and the public defender had started and made an argument, and then he says he doesn't want him anymore, that'd be different, but that didn't occur here. So I just don't see that other than he expressed his intent to stay pro se all along. It's never interrupted. I agree with the bizarre timing of what happened. And to the extent that the public defender never took any action on Mr. Williams' behalf, I think the record also bears that out. All the public defender shows up in court to do is say that they don't want to represent. Mr. Williams doesn't want the representation. That's the only thing the public defender does in the court. And I think the action of the court the day before formally appointing the public defender, to me, that should be sufficient to appoint a public defender. And therefore, as far as the actual denial of counsel issue goes, that's the crux of the issue is the appointment on the prior day. But this is a two-piece argument. One is that he was denied counsel simply by the appointment and then proceeding without counsel. The second piece of the argument, though, is the admonishment requirement that comes not from appointment of counsel, but the request of Cleveland cites the Supreme Court in that case where they're listing scenarios where re-admonishments would be required. And it's not that in Cleveland's case, it was pro se for a portion of trial, a request for counsel for a specific portion of the trial, there it was sentencing. And then the recantation or the withdrawal of that request. But what the operative act was in requiring the admonishments is simply opining to the court or making a request for counsel. At that point, the court is required, once they say again, actually, I think I want to be pro se, then the appointment itself doesn't particularly matter whether the court did or did not make the appointment. What matters is that the court has a duty to make sure that this pro se defendant who is clearly, you know, gaming things out for themselves, there's a strategic move that they're trying to do whatever, or they have feelings about a public defender. The obligation of the court is to make sure a pro se defendant knows what they're doing and makes a knowing and has made a knowing involuntary waiver. And so the waiver from seven months prior, once there's a request for counsel, that waiver doesn't matter anymore. It doesn't, it does not carry over. It's the request itself that makes a real difference here and not the formal appointment of counsel. So I think we could be reversed on the counsel issue as a denial of counsel, but then upon the same token, the 401 issue, it's the request of counsel at that point. Aurelia, I mean, I'm sorry, Cynthia, did you want to go ahead? I do. Sorry, Justice Pachinski. Upon the appointment of the public defender, are they required to file an appearance or anything of that nature? The statute does not require that. The public defender statute itself is where I took the appointment of the court. I think, I'm sure it's trial practice and whatnot that in the trial courts, you do need to have an appearance on file in order to appear before the circuit court and take legal action. But in practice, that's also not the case that plenty of times a defendant will have counsel stand up and represent them. And then the court says, oh, go file your appearance and it gets done afterwards. So the piece of paper, while it does have some import in the circuit court, I think functionally, it's not the indication of representation. And particularly here where it's just an assistant appointed defender, someone like me in the trial courts, but the appointment itself happens by function of the court, not anyone actually showing up. Otherwise, you could have a day where the public defender gets appointed and an assistant says they're not going to represent the client for whatever reason and refuses to file the paperwork. And we can go this really bizarre span where there's not appointed counsel simply because an assistant decides they're not going to do the representation. I think that the function of the court makes the legal action on their behalf. But as far as like the relationship, it's not a contractual relationship between the client and the office. It's a relationship between the court and both entities. But hasn't there been an occasion where the public defender has declined to represent even upon appointment and they declined to represent and no appearance has been filed or an appearance is asked to withdraw? I'm not sure I agree that the court simply pronouncing that the public defender is appointed is sufficient or is synonymous with an appearance to present before the court. Do you have a case or something you can cite us to that would support a conclusion that once the court pronounces that the public defender's office is appointed, they need not file an appearance? I don't have any case. I've sought it out and my awareness of any denial by the public defender is more contemporary that I don't know that there's any case on at the moment. If your honors would be willing, I would file a motion if I do find one. I will grant if you would ask, I would ask leave in the occasion that that comes up, but I have not been able to find that at this point. Just in following up on Justice Fitzgerald Smith's question, this was really unique. It's a day. For all we know, the public defender simply walked into a room and saw the defendant's face and the defendant said, I don't want to be represented by you. Absent something else, how is this similar to any other case where there's been some intervening act or conduct that would suggest to the court that admonishments were in order again? Only in the matter of the fact of the request itself being the operative element, and I think what it does, the purpose of the admonishments themselves are to ensure the knowing involuntary waiver by the pro se defendant. What the admonishments functionally do here is give the court the opportunity to make a clear headed view, at least a little bit of what the defendant is doing. Are there other issues? Because otherwise, you've got a pro se defendant standing before the court who is making terrible decisions, which he's allowed to do, but the court can't be sure of whether whatever is going on with why he would, in a one day scenario, make a request and then take it back. I think the admonishments serve a critical function here of allowing the court at least some to check into this breach and determine what's going on. And that is to say, ensure that the right to knowing involuntary waiver is what's actually taking place here. But just one more point after the defendant said, I don't want, or after the public defender said, defense defendant doesn't want to be represented. There was a brief dialogue or conversation between the defendant and the court. So it wasn't simply that the public defender said he doesn't want representation. There was some additional brief discussion between the attorney, between the judge and the defendant. As I recall, the judge said, you don't want an attorney. Is that right? You want to go, you want to continue to be pro se. So they did have that discourse. Is that correct? It wasn't as though the court just simply accepted what the public defender offered. There was some dialogue between this seemingly somewhat able defendant who drafted his own motion and the court. That's correct. And I think that's why when it comes to the admonishments, substantial compliance is the standard for which the court looks. And that's happened in Cleveland, actually. The standard for which Cleveland, the discourse in Cleveland was judged was substantial compliance. And the court there found, I believe it was the nature of the charges and the potential range of sentence. Those two were, the court missed that portion. And that was found to be out of substantial compliance. And that's why Cleveland got kicked back for what it's worth. The case cited by Cleveland, I think only the only thing that the trial court missed was the sentence. And in that case, they said that is substantial compliance. And so there, it's not just that we're, you know, it's not my idea that you need to check in with the defendant and make sure that the rule is substantial compliance. I think Cleveland chose both. Itself is a case where there was not substantial compliance with the 401 admonishments on this bizarre arrangement. But then it does cite a case where there was substantial compliance. So this is not, it's not a technical issue where we're trying to say, oh, you sort of got appointed. Now you have to do a whole bunch of extra work. The court says, you know, this is a very minor inconvenience to the court. And in the bizarre cases, like Mr. Williams's case, essentially, it's not going to be a big deal for the court to go through the full admonishments and to substantially comply. And only in situations like Mr. Williams, will it get sent back to the trial court. And so that's why we're asking, following Cleveland's application of the rule, that it be remanded on issue two. Anything further? Nothing from me. Thank you, Judge. No, thank you. Okay, Justin, I guess you can proceed. Thank you, your honors. Good morning, counsel, your honors. My name is Assistant State's Attorney Justin Erb. I'm here representing the people of the state of Illinois. May it please the court. To begin, this court should not consider defendant's argument that he was involved, that he involuntarily abandoned his gun on appeal because that argument was not made to the circuit court. His motion to suppress defendant argued that it was impossible for Officer Bracamontes to view him abandon a gun because he did not have one. And that even if Officer Bracamontes saw him abandon a gun, he would have no idea whether he was licensed to carry that gun. There is no evidence presented at the trial that Officer Bracamontes' threat to use his taser actually caused, oh, I apologize, at the motion, not the trial, threat to use his taser actually caused defendant to abandon his gun. Defendant has completely changed his theory here on appeal. The issue has been waived and it should not be considered. However, if this court does reach the substance of defendant's argument, this court's denial of his motion is still proper. In Hodari v. Adopted in the state's decision in People v. Thomas, the United States Supreme Court established a clear, common sense, bright line rule. A suspect is seized under the Fourth Amendment when they're actually seized, which is to say they're under a police officer's physical control. If a person leaves after an officer tells them to stop, then that person has not been seized. So here are the facts of this case. The Chicago Police Department received two 9-1-1 calls from concerned community members saying that there's a group of men outside our houses, they have guns, and it looks like they're about to shoot each other. The police arrived and they're greeted by a group of young men. When defendant, who was in that group, saw the police car, he immediately ran away. Officer Bracamontes, who was about to get out of the car, yelled in his police cruiser that he's going to tase somebody, and defendant threw something into a nearby courtyard, which later Officer Bracamontes found out to be a gun. Only after the weapon was hidden, defendant stopped running and then was seized by the police. There's absolutely no question that Officer Bracamontes had reasonable suspicion, at least to believe defendant was about to or in the process of committing a crime by the time he actually was seized. The Chicago Police Department knew that there were two independent calls, both describing both the same thing, both worried that somebody was going to be shot. He went to the scene and saw a group of people matching that description. He immediately, upon coming there, saw a group of people run away. As the U.S. Supreme Court held in these facts alone are sufficient to conduct a Terry stop, but the analysis does not end here. He chased after defendant where he saw that he threw an object into a nearby courtyard. When he caught, he caught up to him, gave him a pat down and directed his partner to look into that courtyard where he saw that defendant drew the object and then learned there that it was a gun. After that, he asked defendant if he had a Floyd card. Defendant said no. He was placed under arrest. Defendant now argues that he was effectively seized when Officer Bracamontes yelled that he was going to use his taser. So the fact that he threw away his gun constituted involuntary abandonment. This is inconsistent with Thomas Wardwell and the facts of this case. Officer Bracamontes did not threaten the use of force until defendant ran away. He was not prompted to throw away the gun by improper police action. He threw away the gun because he knew he was about to be caught with an illegal gun. Officer Bracamontes had a reasonable suspicion to stop defendant when he ran away. He only gained more evidence that defendant was committing or was about to commit a crime when he threw away the gun before he was seized. There was more than reasonable suspicion to believe defendant was in the process of committing a crime or was committing a crime. The Illinois and United States Supreme Court have spoken authoritatively on this issue. Therefore, the gun was voluntarily abandoned. And for those reasons, this court should affirm the court's holding. Moving to the second issue, whether defendant should have been re-admonished of his decision to proceed pro se. This argument is without merit as well. Defendant correctly summarizes in the holding of People v. Cleveland that if a defendant changes his mind about proceeding pro se, that he should be re-admonished. But this is simply not the situation that this court is faced with. Defendant was properly admonished of the consequences of his decisions to proceed pro se at his arraignment hearing. When he lost his motion to suppress the gun, he indicated that he wanted a public defender to represent him going forward. The court clearly told him that he could not do that at the moment because there was no public defender available, so he'd have to wait until the next hearing. Between hearings, defendant met with a representative of the public defender's office and decided that he did not want to be represented by a public defender and chose to continue pro se. A public defender said they had a meeting between those hearings. While in Cleveland, the defendant represented himself pro se after being admonished, lost the bench trial, was appointed a public defender, and then again asked to proceed pro se. This and that court failed to re-admonish him. Here, the defendant was never appointed anybody to begin with. No public defender or any lawyer filed an appearance in this case. Nobody ever appeared in court on defendant's behalf. We do not even know whether defendant would have qualified to be represented by a public defender at that stage, or the court would not have known. Defendant was never appointed, nor did he hire an attorney, so there was no need to re-admonish him. Finally, this court should not reverse defendant's conviction because although the letter from the Illinois State Police was admitted in error, it did not affect the outcome of the case, and therefore this court should not reverse defendant's conviction. To begin, defendant did not preserve the issue. In his motion for a new trial, defendant argued that the letter should have been excluded because officer Bracamontes did not have knowledge of the letter or its contents during his arrest, which is entirely different than the confrontation argument he makes on appeal. However, under either standard, this court should uphold defendant's conviction because the error was completely harmless. In this case, defendant himself admitted that he did not have a FOI card, not only during his testimony, but to officer Bracamontes himself when he was arrested. That's applied to the court with more than sufficient evidence to satisfy the elementary requirements of unlawful use of a weapon. Defendant, however, argues that it is possible that he was referring to his physical card when he told officer Bracamontes that he did not have a FOI card. It is completely contrary to common sense and the human experience to believe that defendant would have taken such a literal interpretation of the police officer's question where his freedom was on the line and then never bothered to correct himself when it became clear what officer Bracamontes was actually talking about. Therefore, this court should decline to reverse defendant's convictions and decline to grant him a new trial. Any questions? No. Daniel, you can proceed, but you were given almost 35 minutes initially, which is double the time that you should have been allowed, so this has to be really short. Your voice evidently is off. Thank you. Primarily, critically, on issue two, I would point out the court in the record on page 143 to 144 says, all right, public defender appointed. That is the court date before counsel was removed, and so it's critical to say regardless of whether he would have a financial means or whatever, public defender was orally appointed by the court, and on issue three, because the issue was preserved, it's the state's burden to prove the error harmless beyond a reasonable doubt, and I think our back and forth has shown that it can't be beyond a reasonable doubt that he didn't have a FOI card because there's this open question and the transcript doesn't clearly show he did not have a valid FOI card at the time of his arrest, and that's the state's burden because the issue was preserved. He did preserve it on page I want to say 26 of his motion for a new trial. He argues fairly simply that the defendant contends the it goes in the motion for a new trial. I apologize that the court card shouldn't have come in, I believe, and I'll just leave it at that. All right. Thank you both. They both argued very interestingly on three unique issues. Your briefs were very well done, made it easy for us to know what you were going to tell us, so thank you very much, and we'll let you know the outcome within the next two, two and a half weeks. Thank you.